The State v. Bryant.

## The State v. Bryant, *Appellant.*

1. **Criminal Law :** MANSLAUGHTER : SELF-DEFENSE.  The court, on a trial for murder, instructed the jury that the law does not permit a person to voluntarily seek or invite a combat, or put himself in the way of being assaulted, in order that, when hard pressed, he may have a pretext for taking the life of his assailant, and, if the defendant voluntarily sought or invited the difficulty, or brought it on by any wilful act of his own, or voluntarily entered into it of his own free will, then the defendant could not be acquitted on the ground of self-defense; but, if the deceased first assaulted the defendant, or the defendant entered into the difficulty with no design to use his pistol, or with no felonious intent to kill, or to do great personal injury, and while under the influence of violent passion, aroused by the conduct of the deceased, he drew his pistol during the altercation, and fatally shot and killed the deceased, but not in a cruel or unusual manner, without malice, whether with or without intent to kill, and under such circumstances as did not justify him on the ground of self-defense, then the jury should convict of manslaughter in the fourth degree ; and that, before the jury could refuse the accused the benefit of his plea of self-defense, on the ground that he voluntarily entered into the difficulty, they must find that he had at that time a felonious intent to maim, wound or kill.  *Held* that the instructions were substantially correct.

2. **Murder :** SELF-DEFENSE.  The evidence in this case reviewed, and *held* that there was no self-defense in the case.

*Appeal from Platte Circuit Court.*—HON. JAMES M. SANDUSKY, Judge.

AFFIRMED.

*R. P. C. Wilson* and *Woodson & Woodson* for appellant.

(1) The court erred in excluding the evidence offered by the defendant, because it tended, *first*, to show the beginning of the trouble, and explain in what sense defendant used the word "thief." There is a vast difference in calling a man a thief, in so many words, and in telling him that he will prove him to be a thief,

by his own admissions, and especially so when you are trying to prove the state of a man's mind by the use of such words. And, *second*, we had the right to show that deceased and defendant once before had a combat, in which the former struck the latter with a mill pick, and that the wound proved almost mortal. This would have shown the degree of hatred deceased entertained toward defendant, and would cause defendant to anticipate greater danger, when assaulted by him a second time, than he would have done if they had only had an ordinary fist fight, and thereby cause defendant to act quicker and more desperately toward him than he would have done if the former fight had been only a fist fight. (2) The court also erred in giving the instruction, telling the jury that they had "no right to permit their feelings of sympathy to interfere with their duty," etc. This is a vicious and "cold-blooded" instruction in any case, and especially in this, when there were no facts or circumstances surrounding it that took it out of the ordinary run of cases. Besides, it is against the whole spirit of our jury system. The very object of a trial by jury is to get men who are the defendant's equals, who have the same blood, heart and brains, to try him. The very object of a trial by jury is to get men who are the equals of defendant in blood, heart and brains, so they may better know the emotions, promptings and objects of the accused. This instruction removes all equality between the defendant and the jurors, and makes them pass upon the facts with a heart of steel and blood as cold as ice. Even the judicial tyrants of England were not required by law to banish all feelings and sympathy, if they had any, for the accused when they passed the death sentence on the criminal.

*John M. Wood*, Attorney General, for the State.

(1) The evidence of Bryant, himself, as well as that of all the witnesses for the state and defense, shows

that Bryant began the difficulty. The law is that, where one begins a difficulty, he cannot avail himself of the plea of self-defense, no matter how hard he may be pressed afterward. *State v. Linney*, 52 Mo. 40; *State v. Underwood*, 57 Mo. 40; *State v. Hudson*, 59 Mo. 135; *State v. Christian*, 66 Mo. 138; *State v. Maguire*, 69 Mo. 197; *State v. Johnson*, 76 Mo. 121; *State v. Peak*, 85 Mo. 190; *State v. Brown*, 64 Mo. 367. (2) Nor where he voluntarily enters into it. *State v. Peak*, 85 Mo. 190; *State v. Rose*, 92 Mo. 202; *State v. Hardy*, 95 Mo. 455; *State v. Gilmore*, 95 Mo. 566. (3) The failure to give an instruction on self-defense is not error where the evidence shows there was no self-defense in the case. *State v. Gilmore*, 95 Mo. 554; *State v. Anderson*, 89 Mo. 332; *Wilson's Case*, 88 Mo. 13. (4) The court did not err in instructing on murder in the second degree. *State v. Tabor*, 94 Mo. 595; *State v. Lowe*, 93 Mo. 574; *State v. O'Hara*, 92 Mo. 65; *State v. Hill*, 69 Mo. 451; *State v. Curtis*, 70 Mo. 600; *State v. Wieners*, 66 Mo. 24. "The provocation being insufficient, in the eye of the law, to reduce the killing to manslaughter, yet being such as would naturally arouse the passions and excite the mind, would prevent the homicide from reaching the highest grade of murder." *State v. Robinson*, 73 Mo. 308 and 309; *State v. Ellis*, 74 Mo. 219; *State v. Lewis*, 74 Mo. 224; *State v. Kotovsky*, 74 Mo. 247; *State v. Andrew*, 76 Mo. 105. What words of reproach and attendant circumstances will be deemed a just cause of provocation, and constitute homicide murder in the second degree, is, in every case, a question for the court. *State v. Ellis*, 74 Mo. 207. The defendant's testimony must be taken into consideration in determining what instructions should be given. *State v. Banks*, 73 Mo. 592.

SHERWOOD, J.—Indicted for murder in the first degree for killing William Grundon, the defendant was convicted of murder in the second degree, and his

punishment assessed at imprisonment in the penitentiary for the term of ten years. The following is a sufficient statement of the salient facts in evidence :

For some six, eight or ten years prior to the homicide bad blood had existed between the deceased and the defendant, and this enmity still continued down to the time of the trial, though it appears that deceased had, some years after the difficulty or quarrel which then occurred, congratulated the defendant on his reobtaining the deeds to his property before they were recorded. This property, it seems, was some of the same property concerning the possession of which the difficulty arose.

On the twentieth day of April, 1887, in the town of Newmarket, in Platte county, Missouri, deceased came out of the postoffice onto the street ; defendant came out a few steps behind him, and, walking up to him, handed him a paper, saying to him at the time that " there is a notice requiring the possession of the grass lot." ( From the testimony of defendant himself, it appears that deceased had put his cow on a lot claimed by defendant, and the paper handed by him to deceased was a notice to quit the possession of that lot.) When defendant handed the paper to deceased and told him what it was, deceased said he was not the man, and defendant replied that he was " one of the damned thieves." Deceased said he would have to prove it. The defendant then accused deceased of stealing his bins, and called him a " liar, thief and son of a bitch." They quarreled for a while, some of the witnesses testifying that each called the other a liar, others testifying that the only abusive language used was by defendant. Defendant took a step or two away as if he was going to leave, and then returned and shook his hand under deceased's nose. He had a cane in his right hand which he changed to his left, and with his right he pulled out a pistol and fired five times at deceased, all of which took effect. Several times during the quarrel

defendant was seen to put his hand in the pocket in which he had his pistol. When defendant fired the first shot, deceased slapped his hands to his sides and commenced jumping around and trying to get away. One of the shots was fired after deceased had his back turned. The deceased was unarmed, and at no time during the quarrel made an attempt to strike defendant. Immediately after the shooting, defendant said that that was what he had been wanting to do for some time, and now they might hang him. Deceased went to his home in Newmarket, where he died from the effects of the wound two days afterwards.

Defendant claimed that, just before he pulled his pistol and commenced shooting at deceased, deceased put his hand in his pocket as if he was going to draw a weapon, and that he shot him in self-defense. It was shown, also, that Grundon had threatened the defendant, and that these threats had been communicated to the latter.

During the progress of the trial, the defendant offered to show that, at the time of the difficulty before mentioned, the deceased had made a dangerous assault upon him with a mill pick, a deadly weapon ; but the court, on objection made, refused permission to introduce the details of this difficulty, but permitted defendant to show that he and deceased had a difficulty at the time mentioned, and to show that threats had been made then or at any subsequent period, and the state of feeling which had thenceforward existed between the parties. The claim of the defendant was that the shooting was done in self-defense.

The instructions given by the court of its own motion and at the instance of the state were such as are usually given in cases of this sort.

The fifth instruction, given by the court of its own motion, contains the substance of similar instructions heretofore approved by this court.

The State v. Bryant.

The sixth instruction, which the court also of its own motion gave, was the following:

" In this connection the court instructs the jury that the law does not permit a person to voluntarily seek or invite a combat, or put himself in the way of being assaulted in order that, when hard pressed, he may have a pretext to take the life of his assailant; and if you believe, from the evidence, that the defendant voluntarily sought or invited the difficulty in which Grundon lost his life, or that he provoked, or commenced, or brought it on, by any wilful act of his own, or that he voluntarily entered into the difficulty of his own free will, then you are not authorized to acquit him on the ground of self-defense. On the other hand, if you find from the evidence that Grundon first assaulted the defendant, or that defendant entered into the difficulty with no design to use his pistol, or with no felonious intent to kill or to do great personal injury, and while under the influence of violent passion aroused by the act and conduct of Grundon he drew his pistol during the altercation and fatally shot and killed the deceased but not in a cruel or unusual manner, without malice as defined in these instructions, whether with or without intent to kill, and that he did this under such circumstances as did not justify him upon the ground of self-defense as defined in the fifth instruction, then you should convict the defendant of manslaughter in the fourth degree."

The court thereupon modified two of the instructions asked by the defendant, and, as modified, gave them as follows :

" 4.   You should consider all threats which you may believe from the evidence were made by the deceased against the defendant, and give them such weight, in determining the nature of the transaction giving rise to the charge for which defendant is now on trial, as you deem proper.   Mere threats, however, will

not justify, on the ground of self-defense, the shooting alleged in the indictment; nor will threats alone warrant the party against whom they are made in attacking or killing the party who made them.

"5. The court instructs the jury, that before they can refuse to allow the defendant the benefit of the plea of self-defense, on the ground that he sought or voluntarily entered into the difficulty with deceased, they must believe from the evidence that defendant at the time he so sought or voluntarily entered into the difficulty with deceased was actuated by a felonious intent to maim, wound or kill said deceased." This instruction should be read in connection with the sixth instruction given by the court of its motion.

The jury having returned a verdict of the nature above indicated, and judgment and sentence having been entered and passed, the defendant appealed to this court.

But two points in this record require discussion; the first, the correctness of the instructions given; the second, whether error was committed in refusing to admit certain testimony offered by the defendant heretofore set forth.

As to the first:

I. The sixth instruction given by the court of its own motion, and the fifth instruction as modified by the court, though they cannot be commended as models or precedents, yet, taken together, they substantially contain the elements of the striking antithesis between beginning a quarrel *with*, or beginning it *without*, a felonious intent, as heretofore laid down in cases of *State v. Partlow*, 90 Mo. 608; *State v. Berkley*, 92 Mo. 41; *State v. Davidson*, 95 Mo. 159; *State v. Gilmore*, 95 Mo. 554; *State v. Parker*, 95 Mo. 388; *State v. Herrell*, 97 Mo. 105.

These instructions also taken as a whole recognize the distinction pointed out in the cases cited between the right of *absolute* self-defense, where no blame whatever attaches to the slayer and where the slayer being

somewhat to blame by reason of having begun the quarrel, but without felonious intent, has a *limited* or *qualified* right of self-defense, which reduces his offense from what would otherwise be murder in the first degree to manslaughter in the fourth degree. The defendant has no ground of complaint against these instructions.

II. But those instructions regarding self-defense might have been more obnoxious to criticism in point of form than they are, and still there would have occurred no reversible error, and for this reason : *There was no self-defense in the case,* because no one can read the record in this cause with any degree of attention, without being impressed with the idea that defendant began the quarrel with the felonious intent to take the life of Grundon. Almost the first words he spoke to the latter were of foul abuse, continued with numerous repetitions and variations down to the fatal termination. Armed with a large cane, he frequently ran his hand in his pocket where his pistol was, and then at the last, failing to induce Grundon by personal abuse to strike him, he stepped off as if about to go, then, suddenly turning, he came back, changed his cane from his right hand to his left, shook his hand under Grundon's nose, and, this failing to cause Grundon to respond in kind, he drew his pistol and commenced firing on his victim, shooting him five times, once in the back ; the latter jumping around and trying to get away.

Immediately the cruel deed was done, the defendant said that was what he had been wanting to do for some time, and now they might hang him ; thus showing only too plainly the original murderous purpose which fired his heart, and made that heart " regardless of social duty and fatally bent on mischief."

Should we grant that the defendant fired the first shot upon the impulse and idea of self-preservation, the subsequent shots fired upon a non-resistant and fleeing adversary, and the final remark made by the defendant

leave no room to doubt that apprehended danger was not the prompting motive which urged him on. In the recent case of *State v. Gilmore*, 95 Mo. 554, where the circumstances were analogous to the case at bar, and the testimony of the defendant was similar as to the other party making a movement as if to draw a weapon, though none was drawn, it was held, notwithstanding the testimony of the defendant, that there was no self-defense in the case ; that no imminent peril existed, such as would admit of no delay, and, consequently, no necessity existed for the defendant to resort to extreme measures until his situation had become imminently perilous ; that the right of self-defense did not arise until defendant had done everything in his power to avoid the necessity of shooting his adversary ; and it was further ruled in that case that self-defense did not exist in that instance, as shown by the defendant continuing to shoot at his fleeing adversary, even after he had fallen to the floor, and that the physical facts in the case could not be ignored.

So here, the physical facts in the case are equally plain, and we shall not stultify ourselves by believing the defendant's *words* in preference to his *acts ;* the latter are the true exponents of his intention, and they furnish the only safe key to his motives. See, also, *State v. Tabor*, 95 Mo. 585.

III. Taking this view of the matter, that there is no self-defense in the case, it becomes immaterial to determine whether the testimony as to the assault made with the mill pick was properly excluded or not.

Finding no error in the record, we affirm the judgment. All concur.