## THE STATE v. TALMAGE, *Appellant.*

### DIVISION TWO.

1. **Criminal Law :** MURDER : ELECTION OF STATE TO PROSECUTE FOR LESSER OFFENSE. The state may elect to prosecute one indicted for murder in the first degree for murder in the second degree.

2. ——— : ——— : ——— : CHALLENGES. Where the defendant is so prosecuted for murder in the second degree, he is entitled, under Revised Statutes, 1889, section 4200, to only twelve jury challenges.

3. ——— : INSTRUCTION : REASONABLE DOUBT. An instruction on reasonable doubt in this case *held* not erroneous.

4. ——— : MANSLAUGHTER IN THIRD DEGREE : INSTRUCTION. The evidence tended to show that defendant was the conductor of a railway freight train ; and that deceased was a telegraph operator ; that defendant came into the office where deceased was, in order to receive his orders ; that defendant called deceased a blackheaded fool; that this provoked a noisy and abusive quarrel, during which defendant held his lantern and glove in his right hand, and made no preparation to be ready for the use of his pistol ; that a, fist fight followed, in which the deceased was the aggressor ; that deceased, by his superior strength, forced defendant across the room, and threw him down on his back, and was striking him on the head, when defendant fired the fatal shot with his pistol. Defendant testified that he had no thought of using his pistol until his hand accidentally touched it as he fell, and that he fired for the purpose of disabling deceased, and to stop his striking him. *Held,* that there was evidence in the case which tended to prove that the homicide was committed in a heat of passion, and "without a design to effect death," and that an instruction should have been given on manslaughter in the third degree.

5. **Criminal Practice :** DEFENDANT'S EVIDENCE : INSTRUCTION. Where the defendant testifies in a criminal case, instructions hypothecated upon his evidence should be given.

6. ——— : ——— : ———. Such instructions may be denied only where the physical facts and uncontroverted acts of the defendant conclusively contradict his testimony.

The State v. Talmage.

7. ———— : EVIDENCE : ENTIRE CONVERSATION. Where a witness testifies as to a conversation between himself and the defendant in regard to the homicide immediately after it occurred, it is proper to allow him to state what he said to the defendant, where such evidence is necessary to make clear the statement made by the defendant in the conversation.

8. ———— : ————. Where the defendant provoked the fatal quarrel and shot deceased, while the latter was only assaulting him with his fists, evidence tending to show that ¦the deceased was a practiced boxer is inadmissible.

*Appeal from Chariton Circuit Court.*—HON. G. D. BURGESS, Judge.

REVERSED AND REMANDED.

*H. S. Priest, Joseph S. Laurie, Samuel C. Major* and *Isaac H. Kinley* for appellant.

(1) There is no foundation for an instruction upon the theory of murder in the second degree. *First.* Conceding the defendant was the aggressor, a concession, in the face of the uncontradicted evidence, yet, if he brought on the affray with no felonious intent, but in the course of the struggle found it necessary to kill deceased in order to save himself from serious personal injury, the offense is manslaughter not murder. *State v. Partlow,* 90 Mo. 608 ; *State v. Parker,* 96 Mo. 382 ; *State v. Herrell,* 97 Mo. 105; *State v. Wensell,* 98 Mo. 137 ; *State v. Elvins,* 101 Mo. 243 ; *State v. Bryant,* 102 Mo. 24 ; *Meuly v. State,* 26 Tex. Ct. App. 274 ; *Hash v. Com.,* 13 S. E. Rep. 398. And such felonious intent must be shown by the state. *State v. Cleveland,* 86 Ala. 1 ; *State v. Gibson,* 89 Ala. 121 ; *State v. Tabor,* 95 Mo. 585. *Second.* The homicidal act, as shown by the state's evidence, was not done in malice, but in the heat of passion, aroused by adequate provocation. ( *a* ) Malice is an essential element of murder in either degree, and is the distinguishing characteristic between murder in the second degree and manslaughter. *State v. Wieners,*

66 Mo. 13; *State v. Curtis*, 70 Mo. 594; *State v. Robinson*, 73 Mo. 306.  ( *b* )  The burden is on the state to prove malice, and the jury are bound to find malice in order to support a verdict as for murder in the second degree.  *State v. Stoeckli*, 71 Mo. 589; *State v. Wingo*, 66 Mo. 181.  ( *c* )  Malice may be implied or presumed from the simple act where an intentional killing with a deadly weapon is shown, and nothing more appears. *State v. Gassert*, 65 Mo. 352; *State v. McKinzie*, 102 Mo. 626.  But no such implication or presumption exists or arises where justification, excuse or mitigation is apparent on the proof offered in support of the prosecution.  *State v. Holme*, 54 Mo. 153; *State v. Tabor*, 95 Mo. 585; *State v. Elliot*, 98 Mo. 151; *State v. Anderson*, 98 Mo. 461, 472; *State v. Curtis*, 70 Mo. 594, 599; *State v. Musick*, 101 Mo. 260, 270; *State v. Jones*, 29 S. C. 201, 235; 9 Am. & Eng. Law Encycl., p. 54, and cases cited in note 1.  ( *d* )  When adequate provocation appears, the existence of malice is negatived, and the homicide reduced to manslaughter. *State v. O'Hara*, 92 Mo. 59; *State v. Curtis*, 70 Mo. 594; *State v. Wilson*, 98 Mo. 440, 448; *State v. Gee*, 85 Mo. 647.  ( *e* )  Personal violence constitutes adequate provocation.  *State v. Starr*, 38 Mo. 292; *State v. Branstetter*, 65 Mo. 149; *State v. Ellis*, 74 Mo. 207, 218; *State v. Stewart*, 78 Ala. 436; Wharton on Homicide, secs. 398, 422; 2 Bish. Crim. Law, sec. 702. ( *f* )  The assault and blows of the deceased in this case were amply sufficient to satisfy all the requirements of the law as to adequate provocation.  *Schlecht v. State*, 75 Wis. 486; *State v. Davidson*, 95 Mo. 155; *State v. Wensell*, 98 Mo. 137, 149.  *Third.*  If viewed in the light of a mutual combat arising upon sudden quarrel, the offense is but manslaughter.  *State v. Partlow*, *supra*, and cases cited on p. 450; *State v. Wilson*, 98 Mo. 440, 450; *State v. Davidson*, 95 Mo. 155.  ( 2 ) The evidence shows that defendant acted in self-defense, and he was, therefore, entitled to an acquittal.

*First.* Mere words will not justify an assault or abridge the right of self-defense. *Com. v. Selfridge*, Horr. & Thomp. Self-Defense Cases, pp. 1, 227. *Second.* The evidence shows that defendant did not intend to provoke a combat; consequently his right of self-defense against the unlawful attack of deceased was unimpaired. *Partlow's Case, supra. Third.* Defendant did not bring on the "difficulty." *State v. Cullen,* 82 Mo. 623; *State v. McDaniel,* 94 Mo. 301; *State v. Harrod,* 102 Mo. 590. *Fourth.* But even though defendant did bring on the difficulty, yet by "retreating to the wall" he recovered his right of self-defense. 4 Black. Com. 184; 3 Greenl. Ev., sec. 116; 2 Thompson on Trials, secs. 2168, 2169; *Partlow's Case, supra; Hash v. Com.,* 13 S. E. Rep. 398; *Jackson v. State,* 28 Tex. Ct. App. 108. *Fifth.* Defendant lawfully exercised his right of self-defense; his apprehension of great bodily harm was reasonable, and under the circumstances he was justified in the use of a deadly weapon. *State v. Harrod,* 102 Mo. 590; *State v. Hickam,* 95 Mo. 322; *State v. Eaton,* 75 Mo. 586; *State v. Gonzales,* 28 Tex. Ct. App. 130; *Pond v. People,* 8 Mich. 150. (3) The court erred in failing to instruct the jury, as required by section 4208, Revised Statutes, upon questions of law arising in the case, which were necessary for their information. *First.* It was the duty of the trial court to instruct upon manslaughter in the third degree, if there was any evidence tending to show that grade of homicide. *State v. Moxley,* 102 Mo. 374; *State v. Turlington,* 102 Mo. 642; *State v. Palmer,* 88 Mo. 568; *State v. Banks,* 73 Mo. 592. *Second.* The evidence tended to show that, although the shooting was voluntary, it was done "without a design to effect death," and being in the heat of passion, aroused by an adequate provocation, it was, if not justifiable in self-defense, manslaughter in the third degree. R. S. 1889, sec. 3471; *State v. McKinzie,* 102 Mo. 620; *State v. Peak,* 85 Mo. 190; *State v.*

*Palmer, supra; State v. Partlow, supra; State v.. Thomas,* 78 Mo. 327, 338 ; *State v. Elliot,* 98 Mo. 150, 156. *Third.* The court ignored the evidence showing defendant's *bona fide* attempts to withdraw from the conflict ; also the evidence tending to show a mutual combat upon sudden quarrel, and failed to instruct the jury upon such phases of the case. *State v. Jones,* 61 Mo. 232 ; *State v. Berkley,* 92 Mo. 41. *Fourth.* The court failed to define "adequate provocation" and "heat of passion," and failed to instruct the jury what passion would reduce a wrongful homicide to the grade of manslaughter. *State v. McKinzie,* 102 Mo. 620 ;. *State v. Walker,* 98 Mo. 107 ; *State v. Sneed,* 91 Mo. 552 ; *State v. Ellis,* 74 Mo. 219 ; *State v. Dunn,* 18 Mo. 419. (4) The court erred in giving and refusing certain instructions, the particulars of which, together with the authorities cited, are set forth in the brief. (5) The judgment should be reversed and the prisoner discharged. *State v. Wingo,* 66 Mo. 181 ; *State v. Primm,* 98 Mo. 368 ; *State v. Owsley,* 102 Mo. 678.

*John M. Wood,* Attorney General, *W. W. Rucker,*. Prosecuting Attorney, and *W. S. Stockwell* for the State.

(1) The offense of murder in the second degree was included in the charge of murder in the first degree, and the abandonment of the allegations, descriptive only of the graver offense, left the minor offense fully charged, upon which the defendant could be legally tried, as if the indictment had in the first instance only been for murder in the second degree. R. S. 1889, sec. 3949 ; *State v. Burk,* 89 Mo. 635 ; *State v. Lane,* 64 Mo. 324 ; *Com. v. Dean,* 109 Mass. 349 ; *Jennings v. Com.,* 105 Mass. 586; *Baker v. State,* 12 Ohio St., 214 ; *Com. v. Tuck,* 20 Pick. 356 ; 1 Bish. Crim. Proc., secs. 1387, 1396. (2) No error was committed in refusing to permit Shores to testify as to "whether or not he knew that Tidd had boxing gloves

:and practiced with them?" *State v. Shultz*, 25 Mo. 129; *White v. Maxcy*, 64 Mo. 559. (3) No reasons were assigned for the objection to the testimony of Brinckley as to what he said in answer to the remark of Talmage as to whether he did right, and the action of the court in admitting the testimony is not reviewable. *State v. Johnson*, 76 Mo. 121; *State v. Brannum*, 95 Mo. 19. (4) The court permitted the defendant to testify how long he had been laid up from the injury received on the train and as to the condition of the wound at the time of the difficulty. The whole matter was testified to by defendant and by experts called on that question, and no error, and certainly none of which defendant can complain, was committed in refusing to further allow him to answer the question objected to. It was not the main fact on trial, and the details of that accident, and all that occurred afterward, were not material. (5) Instruction, numbered 1, in regard to the presumption of innocence and reasonable doubt, is correct. *State v. Gee*, 85 Mo. 647; *State v. Luke*, 104 Mo. 568; *State v. Jones*, 86 Mo. 623; *State v. Dickson*, 78 Mo. 438; *State v. Moxley*, 102 Mo. 374. (6) The third instruction given on the part of the state follows the later decisions of this court, as to the circumstances under which a perfect and imperfect right of self-defense exists, and is correct. *State v. Partlow*, 90 Mo. 608; *State v. Berkley*, 92 Mo. 41; *State v. Gilmore*, 95 Mo. 554; *State v. Davidson*, 95 Mo. 159; *State v. Bryant*, 102 Mo. 24; *State v. Parker*, 96 Mo. 393. (7) The fifth instruction upon the question of self-defense conforms to the rule laid down in the *Partlow case* and subsequent cases and follows approved precedents. *State v. Hicks*, 92 Mo. 431; *State v. McDaniel*, 94 Mo. 301; *State v. Thomas*, 78 Mo. 327; *State v. Bryant*, 102 Mo. 24; *State v. Stillz*, 97 Mo. 20; *State v. Woods*, 97 Mo. 31. (8) It is not alleged in the motion for a new trial that the court committed any error in failing to instruct the jury upon questions of law arising in the

case, which were necessary for their information, and this court cannot review the actions and rulings of the trial court in that respect. *State v. Reed*, 89 Mo. 168; *State v. Burk*, 89 Mo. 635; *State v. McDonald*, 85 Mo. 539; *State v. Mitchell*, 98 Mo. 657; *State v. Emory*, 79 Mo. 461. The questions, therefore, whether the court should have instructed as to manslaughter in the second or third degrees, and upon the theory, that the defendant had in good faith "retreated to the wall," and if so his right to defend himself under those circumstances, are not on the record before this court for consideration. (9) Where the evidence justifies the trial court in submitting the case to the jury, this court will not interfere to disturb the verdict, unless it clearly appears that the jury acted from prejudice or passion. *State v. Hicks*, 92 Mo. 432; *State v. Musick*, 71 Mo. 401; *State v. Lowe*, 93 Mo. 547; *State v. Cook*, 58 Mo. 548.

THOMAS, J.—The defendant was sentenced by the circuit court of Chariton county, in October, 1889, to imprisonment in the penitentiary for ten years for murder of the second degree, and the case is here on his appeal.

I. The defendant was indicted for murder of the first degree, but the state, by permission of the court, elected to prosecute and did prosecute him, for murder of the second degree alone. The defendant interposed an objection to this course, which being over-ruled he excepted and now assigns it for error. This contention is not maintainable. The state had a clear right to take this course, and defendant has no right to complain that the state chose to prosecute him for a less and not the higher grade of homicide. R. S. 1889, secs. 3949, 4115; *State v. Lowe*, 93 Mo. 547; *State v. Keeland*, 90 Mo. 337; *State v. Nelson*, 88 Mo. 126; *State v. Wagner*, 78 Mo. 644; *State v. Burk*, 89 Mo. 635; *Com. v. Dean*, 109 Mass. 349; *Jennings v. Com.*, 105 Mass. 586; *Baker v. State*, 12 Ohio St. 214;

*Com. v. Tuck*, 20 Pick. 356; 1 Bish. Crim. Proc., secs. 387, 1396.

The defendant having been prosecuted for an offense punishable by imprisonment in the penitentiary for a term of not less than ten years, it follows that he was entitled to only twelve and not twenty challenges. R. S. 1889, sec. 4200. Hence there was no error in refusing to allow him twenty challenges.

II.   It is claimed that the court erred in its definition of reasonable doubt. By the first instruction given at the instance of the state the court told the jury, "that the law presumes that the defendant in this case is innocent of the offense charged, and, before you can convict him, the state must overcome that presumption, by proving him guilty beyond a reasonable doubt. If you have a reasonable doubt of the defendant's guilt, you must acquit him; but a doubt, to authorize an acquittal, must be a substantial doubt, arising from the insufficiency of the evidence, and not a mere possibility of his innocence." The objection to this instruction is that it limits reasonable doubt to mere *insufficiency* of the evidence. While we do not approve the phraseology of this instruction as the best that could be employed to define reasonable doubt, we do not see how it could have misled the jury. This objection is too hypercritical. It seems to the ordinary mind that a doubt arising from the *insufficiency* of the evidence is the same as a doubt arising upon a full and fair review of all the evidence in the cause. We will pause here to remark that lawyers and judges are prone to depart from the accustomed definition of reasonable doubt, and to seek a clearer statement by new definitions, but we think it will be found, on a critical, philosophical examination of the question, that the later attempts at the definition of reasonable doubt have not given it perspicuity nor added to the facility of comprehending it. In the nature of things it must be left largely to the triers of the fact. Reasonable doubt

is reasonable doubt, and that is about all that can be said in regard to it.    It has been uniformly held in this state that if upon a fair and full review of all the evidence in the cause the jury entertain a reasonable doubt of defendant's guilt they should give him the benefit of it and acquit him, but such doubt to authorize an acquittal on that ground alone should be a substantial doubt touching his guilt, and not a mere possibility of his innocence, and if the trial courts would adopt the approved formula criticism would be avoided, and this court would not be called upon so often to discriminate between words having nice shades of meaning.

But the court did not stop here.   The defendant asked the court to give and the court did give the following instructions :   "5.   The court instructs the jury that the law presumes the defendant innocent in this case, and not guilty, as charged in the indictment ; and that they should act on this presumption, and acquit the defendant, unless the state of evidence satisfies them of his guilt, beyond a reasonable doubt.

"6.   The jury are instructed that a reasonable doubt of the guilt of a person on trial for a criminal offense is that state of the case, which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say that they feel an abiding conviction to a moral certainty of the truth of the charge—a certainty that convinces and directs the understanding, and satisfies the reason and judgment of those who are bound to act conscientiously upon it."

Taking these with the one given at the instance of the state the question of reasonable doubt was presented to the jury in as clear a light as is practicable in the existing state of written language.   The presentation of the question was certainly as favorable to defendant as the law authorizes.

III.  This brings us to the consideration of the main grounds urged for a reversal of this sentence, which are that the court erred in failing to instruct the jury that they might find defendant guilty of involuntary manslaughter, and in its instructions in regard to self-defense.  In order to dispose of these questions intelligently it will be necessary to give the salient facts.

The defendant shot and killed Charles P. Tidd in the telegraph office at Brunswick, Chariton county, Missouri, on the ninth day of January, 1888, at about half past seven o'clock P. M.  Tidd was twenty-six years old ; defendant, eighteen.  They would have weighed about the same, Tidd being the taller, but defendant was broader across the shoulders.  The depot of the Wabash railway at Brunswick had three rooms, the telegraph office being the middle one, the ladies' waiting room being on the south and the gents' waiting room on the north.  The telegraph office was about fifteen by twenty feet, the long way being north and south. There was no entrance to it from the front, or end next to the railroad, but there were two doors in the northeast corner, one leading outside and the other into the gents' waiting room.  There was a bay window at the front end, which the telegraph operators occupied.  To the right of this bay window looking east, and a few feet back of it, against the south wall was a desk. Along the north wall just south of the door leading into the gents' waiting room there was a stationary desk. The deceased was night operator in this office and a man by the name of Shores was day operator.  Defendant was the conductor of a freight train, running between Brunswick and Stanberry on the Wabash railroad.  Tidd's time to go on duty was seven P. M., but on the fatal evening he was ten minutes late.  Defendant was in the telegraph office a little before seven to get orders for his train, which was on the eve of starting. He had on a heavy overcoat, with fur collar, had a glove

The State v. Talmage.

on his left hand, and had a lantern and a glove in his right hand. He sat in the office and chatted with a friend.

While he was there Tidd came in, hung up his overcoat, put his lunch basket in the locker, stepped to the stove which was near the center of the office, and said, " Good evening, gentlemen." About this time defendant went out to go to his train, when Shores, the day operator, who was still on duty, called him back for further orders. He stepped back into the office, Tidd having taken a position in the meantime at the desk against the south wall near the bay window, his face being to the wall. The defendant went to the bay window, where Shores was, and just as he passed Tidd in the rear he said, "black-headed fool," defendant still having on his overcoat, having a glove on the left hand and holding a glove and a lantern in the right. After defendant made this remark, Tidd waited a second, and then turned to him, and inquired if he meant him, to which defendant replied that he did. Tidd then inquired what he meant. Defendant told him he had reported him, and Tidd said he had not. They repeated this over two or three times, and finally defendant told Tidd he lied, as some of the state's witnesses testified, whereupon Tidd struck at defendant, and defendant struck with his lamp, both striking about the same time. They then clinched and tustled around back of the stove into the northeast corner of the office, striking at each other. Tidd forced defendant against the stationary desk near the door in the northeast corner of the office, and had him partly down, when the shot was fired, the ball entering Tidd's breast-bone, passing through the main artery just above the heart, and making its exit through the right shoulder blade. Tidd straightened up, and said, "I am shot," fell to the floor, and expired in a few moments without uttering another word. Defendant, after the shooting, had a pistol in his hand. Upon examination it was

found that defendant had no wounds about the face, but had a small bump on the back of his head and a small wound on the back of his neck. The deceased, besides the pistol wound, had a wound on his neck in front, which seemed to have been inflicted by some rectangular instrument, and his lip was cut, as if it had been pressed against his teeth.

The evidence on the part of the state does not disclose the exact position the parties occupied at the time the shot was fired, but there was evidence tending to show that they were both partly down, but the preponderance of the evidence is that Tidd was above and leaning over him. No one saw the pistol before the shot was fired; indeed, no one present, and there were several in the office, thought there was anything serious going to happen, Shores, the operator, not even stopping his work to notice the trouble though he heard and saw its beginning. Tidd had no weapons. Defendant went to the caboose of his train, and reported what he had done, and made no effort to escape at any time. This is substantially the case as made by the state's witnesses, several of whom were in the office during the difficulty.

On the part of the defendant, it appeared that he was brakeman on the Wabash railroad, and he received an injury on the head in September, 1887, in crossing a bridge, which caused congestion of the brain, and laid him up for some time. This injury made his head more susceptible to pain and injury than it would otherwise have been. Defendant claimed that McGregor, the train dispatcher, had informed him that Tidd had reported him saying simply that his conduct would bear investigation. Defendant's version of what occurred at the time of the homicide is in substance as follows : He said : "I came into the depot for my orders to take my train out, and about seven o'clock I started to go out of the office, and the day operator called me back, and as I came back I noticed Mr. Tidd was in the office then, and I said to him. 'That is a nice fool trick to

The State v. Talmage.

report me that way;' and he waited a while and then turned up and says, 'Who are you speaking to?' I said, 'Don't you think you are for reporting me the way you did, that the matter is worth investigating without saying anything further about it;' and he commenced to laugh, spoke to me about being a snip of a conductor and didn't know how to run a train, one thing and another like that, and he said, he didn't report me that way; I told him the dispatcher, McGregor, told me he had reported me and spoke to me about it up there; well, he said he hadn't, well I said, 'Somebody has lied about it, either you or McGregor, and he says, 'No, you are a liar.' I says, 'All right, that may be.'" He then stepped back, and Tidd struck at him and the lick glanced his neck. He threw the lantern and his hand hit Tidd's shoulder, the lantern striking Tidd in the middle of the back, and was knocked out of his hand. The glove also at the same time fell out of his hand. Tidd caught the defendant by the collar and struck him with his hand. They were then in the southwest corner of the office. He had hold of Tidd with the left hand, trying to push him off, but Tidd pulled defendant towards him and commenced hitting him. Defendant put his hand over his head to keep from being hit in the head at all. Defendant tried to get away and get out of the door, he did not expect in the first place to have any fuss or desire to have. They went toward the door sideways, defendant trying to pull away, and Tidd holding on to him and striking him till they reached a table and fell over on it, Tidd being on top. Tidd held him down and struck him at least ten times; it felt like he had something in his hand; it felt like one more blow would be the last of him. Tidd pulled defendant off the table and defendant went down near the door in the northeast corner of the office, and as he fell he threw his hands back on the floor to break the force of the fall and tried to get up again and Tidd shoved him back, and as he fell the back of his hand

came in contact with the butt end of the pistol. Tidd kept him down and pounded him pretty hard, it felt like another one of those blows would be the end of him.

He says: "When my hand touched the revolver I pulled it for the sole purpose of disabling him, so he would stop hitting me * * * After the shot he raised right up on his feet, and said, 'I am shot,' and fell over."

He says he never struck at Tidd after the lantern fell out of his hand and he tried to get away. About ten days after this he had congestion of the brain, so the doctor said. On cross-examination he said he made no call for assistance, for, while there were five or six men in the office, they were not his friends, and it would have done no good; he gave Tidd no warning that he was going to use his pistol nor tell him if he did not let him alone he would shoot; he called Tidd a black-headed fool, and when asked by Tidd if he repeated it, he said he did; Tidd had not then tried to strike him, and defendant did not then think there would be any difficulty. Defendant was vexed and mad because Tidd had reported him, and he wanted to let him know what he thought of a man that would do that; as they went across the room, Tidd was striking him and he held his face close to Tidd's breast, and tried to shove Tidd off with the left hand, and he had his arm over his head to protect it. He did not think of shooting until his hand touched the pistol, while he was down; then the thought flashed over him to shoot to get him off, and he drew the pistol and instantly shot. Tidd had hold of him with his left hand, and was hitting him with his right, when the shot was fired. Defendant said he did not shoot while in a heat of passion, but because he thought that was the only way to get him off.

Defendant was corroborated in all essential particulars, except as to how and why he drew the pistol and

shot, by Cunningham and Moses, two eye-witnesses of the homicide. The court by its instructions authorized the jury to find defendant guilty of murder of the second degree, or manslaughter of the fourth degree, or acquit him on the ground of self-defense. The court properly defined murder of the second degree, and defined the technical terms used in such definition.

The chief contention is that the court erred in defining the right of self-defense. On this phase of the case the court instructed the jury at the instance of the state as follows : "If the jury believe from the evidence, beyond a reasonable doubt, that the defendant, James C. Talmage, provoked the difficulty, or began the quarrel with Chas. P. Tidd, with the purpose of taking advantage of the deceased, and of taking his life, or of doing some great bodily harm, then there is no self-defense in the case, however imminent the peril of the defendant may have become in consequence of an attack made upon him by the deceased, and, if in such circumstances, the jury believe from the evidence, beyond a reasonable doubt, that the defendant, James C. Talmage, killed the deceased, Chas. P. Tidd, then you should find the said Talmage guilty of murder in the second degree. But, although the jury may believe from the evidence, beyond a reasonable doubt, that the defendant began the quarrel, or provoked the difficulty with said Tidd, yet if they also believe from the evidence that this was done by the defendant without any felonious purpose, and that thereupon said Tidd attacked him and compelled him, in order to save his own life, to take the life of the deceased, still the law, while it will not entirely justify the homicide on the ground of self-defense, will hold the defendant guilty of no higher grade of crime than that of manslaughter in the fourth degree."

"The court instructs the jury that the right of self-defense is a right which the law not only concedes, but guarantees, to all men. If the jury, therefore, believe

that at the time defendant shot the deceased he had reason or cause to apprehend a design on the part of the deceased to do him some great personal injury, and that there was reasonable cause for him to apprehend imminent danger of such design being accomplished, and to arrest such apprehended danger he shot, and at the time he shot he had reasonable cause to believe, and did believe, it necessary for him to use his pistol in the way he did, to protect himself from such apprehended danger, then, and in that case, the shooting was not felonious, but was justifiable, and you should acquit the defendant on the ground of necessary self-defense. It is not necessary to this defense that the danger should have been actual or real, or that it should have been impending and immediately about to fall. All that is necessary is that the defendant had reasonable cause to believe, and did believe, these facts. However, before you acquit on the ground of self-defense, you ought to believe that the defendant's cause for apprehension was reasonable. Whether the facts constituting such cause have been established by the evidence, you are to determine, and, unless such facts have been established by the evidence in this cause, you cannot acquit the defendant on the ground of self-defense, even though you may believe that the defendant really thought he was in danger. On the other hand, the law does not permit a person to voluntarily seek or invite a combat, or put himself in the way of being assaulted, in order that, when hard pressed, he may have a pretext to take the life of his assailant. The right of self-defense does not imply the right of attack, and it will not avail in any case when the difficulty is sought for and induced by the party by any wilful act of his, or where he voluntarily, and of his own free will, enters into it, with the purpose of killing his adversary, or doing him some great bodily harm, no matter how imminent his peril may become during the progress of the affray. The necessity being of his own creation shall not

operate to excuse him. Nor is anyone justified in using more force than is necessary to get rid of his assailant. But if he does not bring on the difficulty, nor provoke it, nor voluntarily engage in it, he is not bound to flee to avoid it, but may resist with adequate and necessary force, until he is safe."

"6. Even though the jury may believe from the evidence that Tidd made the first assault upon the defendant Talmage, and struck Talmage with his fist before Talmage struck him, yet, unless the jury further believe from all the facts and circumstances detailed in evidence in the trial of this case, that at the time the defendant fired the fatal shot he had reasonable cause to believe, and did believe, that Tidd was about to do him some great personal injury, and that the defendant Talmage had reasonable cause to apprehend that such harm or such injury was about to fall, and that he shot, at the time he did, to avert the danger that threatened him, then there is no self-defense in the case, and you cannot acquit the defendant upon the ground of self-defense. If you believe and find from the evidence in the cause that the deceased, Tidd, first assaulted the defendant, or that the defendant entered into the difficulty with no design to use his pistol, and while under the influence of violent passion, aroused by the acts and the conduct of said Tidd, he drew his pistol during the altercation, and shot and killed Tidd, without malice, as defined in these instructions, and that he did this under such circumstances as did not justify him upon the ground of self-defense, then you should find the defendant guilty of manslaughter in the fourth degree."

The following instructions were given on the same subject at the instance of defendant: "The court instructs the jury that if they believe and find from the evidence that defendant, in the manner and by the means named in the indictment, shot and killed the deceased, Chas. P. Tidd, but shall also find and believe

that in so doing the defendant was acting in the neces-sary defense of his own person, you should not find him guilty of any offense whatever. You must acquit on the ground of self-defense, if it appears that defendant was apprehensive, in consequence of the acts of the deceased, that injury of a bodily nature to himself was impending, and about to fall on him, and that the taking of the life of the deceased was, under the circum-stances, apparently or actually necessary to prevent such injury; if, therefore, you shall believe from the evidence that from the conduct and acts of the deceased, at the time he was shot and killed by the defendant, he, the defendant, had reasonable cause to apprehend, and did apprehend, that there was danger of the deceased executing his purpose and accomplishing his design, and that he, the defendant, shot and killed the deceased for the purpose of preventing such execution and such accomplishment, the verdict should be that the defendant is not guilty, because such shooting and killing, under such circumstances, is justifiable in law, because it was done in self-defense."

"You must observe that, in order to acquit on the ground of self-defense, it is not necessary that the danger of death or injury to which the defendant appre-hended himself exposed was real or actual, or that it was impending and about to fall on him; it is only necessary that it should appear to you that the defend-ant so apprehended himself to be exposed to such danger, and that his apprehension was reasonable, considering the circumstances of the case, as proven, and the situation of the parties at the time, and that he acted in good faith upon the situation as it appeared to him, and under a real apprehension of danger to himself."

And on its own motion the court instructed on the same subject as follows: "The court instructs the jury that although they may believe that the prisoner at the time of the killing of the deceased used abusive

language towards the deceased, yet no words, however grievous, would justify the deceased, Chas. P. Tidd, in assaulting and beating the defendant, or in doing him great personal injury. And if the jury believe that the deceased, Chas. P. Tidd, upon the provocation of words alone, first assaulted the defendant, and was about to do the defendant great personal injury, or bodily harm, the defendant had the right to repel force by force, and to use whatever force was necessary to prevent the deceased from doing him great personal injury, although the means employed and the weapons used resulted in the death of the deceased, and if the jury so believe they should acquit."

These instructions taken as a whole present the doctrine of self-defense as favorably to defendant as the law justifies or he could reasonably ask. Indeed, the instruction given by the court on its own motion is not the law. We cannot sanction the doctrine that a man may provoke a difficulty by abusive language, and, if the party provoked resents it by force, he may be killed with impunity. We concede that if the difficulty be provoked without a felonious design the party may not be guilty of murder, but that he would be guilty of some offense we have no doubt, no matter how fierce the passion of the insulting party or how imminent his peril may become during the difficulty. This instruction was without question erroneous, but the error was in defendant's favor, and hence he has no right to complain.

We think there was no involuntary manslaughter in this case, and the court committed no error in failing to instruct on that grade of homicide. The defendant wilfully used a deadly weapon upon a vital part, and he must be held to have intended the necessary and probable consequences of his own act. It is not necessary for the state to prove, in order to convict of murder of the second degree, that the slayer had a *specific* intent to kill. The intent to kill in murder of that degree may

be presumed from the wilful use of a deadly weapon upon a vital part. *State v. O'Hara*, 92 Mo. 59 ; *State v. McKinzie*, 102 Mo. 620. "When the act is malicious and manifestly dangerous to human life, and does produce death, the law will presume an intent to kill." *State v. O'Hara, supra.*

IV. The defendant contends that the evidence did not warrant his conviction of any offense, and especially of murder of the second degree. There can be but two theories deduced from the evidence with any plausibility, and these are: *First.* That defendant provoked the difficulty with no design to use his pistol, and that he drew it and shot, under the circumstances and with the intent as given by himself. *Second.* That he provoked the difficulty, with no intention of fighting a fair fight, but with the intent to use his pistol, if Tidd resented the insult and undertook to assault him. We will not stop to discuss the question whether defendant provoked the difficulty or not.

And if he did provoke the difficulty without intending to fight on equal terms with Tidd, but provoked it with the design to use his pistol if it became necessary, then he was guilty of murder of the second degree under our statute, notwithstanding Tidd assaulted him even in as violent a manner as is claimed. A homicide committed under such circumstances is murder at common law. It is too manifest from defendant's own testimony that defendant did provoke the difficulty to merit argument, and we will proceed at once to inquire into the motive he may have had for provoking it.

From the instructions given defining self defense, murder of the second degree and manslaughter of the fourth degree, the jury must have found, in order to return the verdict they did, that defendant did intend at the time he provoked the difficulty to use his pistol, if it became necessary ; for one of the instructions directed a verdict for manslaughter of the fourth degree, if the jury found that he did not at the time of provoking the

difficulty intend to use his pistol. Let us see if there was evidence warranting this finding. We do not hesitate to say that there is no evidence that defendant provoked the difficulty for the purpose and with the intent to get an opportunity to *kill* Tidd, but we do think that the jury was well warranted in finding that he provoked the difficulty with no design to fight a fair fight, but with the intent to use his pistol if it became necessary. We think the defendant's own testimony and that of Cunningham and Moses, introduced by him, shows this. Indeed, defendant's version of the transaction at the time of the homicide, and that given by Cunningham makes defendant's conduct more reprehensible than the evidence introduced by the state. It is true defendant says he did not intend or expect a difficulty, and that the idea of using his pistol never occurred to him till his hand touched it, when he was knocked or pushed down in the northeast corner of the office. He says he was vexed, mad, because Tidd had reported that his conduct, as conductor, would bear investigation.

Tidd went into the office, put away his coat and lunch basket, and spoke in a friendly manner to those present. About this time defendant went out of the office to start his train. He was called back on business. He passed behind Tidd, and said, "Black-headed fool." Defendant testifies that he said that to let Tidd know what he thought of a man who would report him the way he had. Common sense teaches us he intended to insult Tidd. He could have had no other object in making the remark. Tidd turned around, and asked for an explanation. Defendant replied that he meant him and gave him his reason for making the remark. Tidd denied reporting him. Defendant repeated the charge. Tidd again denied. The charge and denial were repeated two or three times. According to the state's evidence defendant called Tidd a liar, but according to his own testimony he simply said there was a lie out, and it lay between Tidd and the train dispatcher. All the

evidence shows that Tidd asked defendant if he repeated the remark "black-headed fool," and the defendant said he did. This was said after Tidd had manifested a disposition to fight. But Cunningham gives a clearer conception of the situation at this juncture, than any other witness. He says, "Tidd raised and turned to Talmage, and asked him who he meant, and if he meant him. Talmage's reply was that he did, and Mr. Tidd said there was no railroad position, that would make him take that, and he didn't propose to take it. *He got up and started towards Mr. Talmage with his fist closed,* and Talmage had a lamp in his hand, and he stepped back and swung the lamp, and when he did so Tidd stopped, and he says, 'What have I said that was not my business?' Talmage replied, 'You know what he says.' Tidd says, 'You still say I am a fool?' *Talmage says, 'I don't take back anything I have said.'* And he started *again* with his fist closed."

Is it possible to believe that Talmage did not expect any difficulty under these circumstances? He not only deliberately insulted Tidd, but after an explanation had been demanded, and Tidd had denied the charge he made two or three times, and while Tidd was standing in a *threatening attitude with clenched fist,* the defendant deliberately repeated the insulting epithet. Not only that, but he had according to his own story virtually called Tidd a liar, and it is scarcely in the range of probability that defendant did not anticipate an assault from Tidd upon the repetition of the insult. The defendant's testimony must, in another aspect, be taken with some grains of allowance. He was not backward in letting Tidd know what he thought of his conduct in reporting him, but he says when Tidd called him a liar, he simply replied by saying, "All right, that may be so." He says also that Tidd called him a snip of a conductor, and did not know how to run a train. If the report that Tidd was charged with making against defendant had so aroused him that even two or

The State v. Talmage.

three denials from Tidd did not appease him, how can we believe that defendant, when told that he was a snip of a conductor and was called a liar, meekly submitted? We are irresistibly forced to the conclusion, that defendant must have expected that Tidd would resent his insults by force. Now what did he intend to do if Tidd should assault him? Of course, we cannot fathom a man's mind, and unerringly say what he thought and intended, nor does the law require this. Men's motives must be determined from what they say and do, and by their environment. That defendant did not intend to fight a fair fight, is manifested from the fact that he did not fight, nor attempt to fight, taking his own statement.

It is argued, that defendant could not have intended to fight, for he was in no condition to fight, having on a heavy overcoat, a glove on one hand and a lantern and glove in the other. This only increases the probability that he intended from the start to use his pistol. We find him in no plight to defend himself in the ordinary way, giving an insult and then deliberately and defiantly repeating it while his antagonist stood before him in a threatening attitude, and yet he would have us believe that he tried to get away and leave the room when Tidd assaulted him. Physically he was on equal terms with Tidd, and why he should be so firm in making known his supposed grievances about having been reported and then after being called a snip of a conductor, and then a liar, and then assaulted, he should desire to seek safety by escaping from the office. The defendant says the lantern was knocked out of his hand by the blow he aimed at Tidd. Whether this be true or not, his right hand did become disengaged early in the fight, which enabled him to use it in getting his pistol. He retreated, holding his head close to Tidd's breast to keep from being hurt. The evidence does not show, but the inference is, from defendant's story, that his pistol was in his hip pocket, and it seems almost absurd to say

that his hand reached the pistol in the way he stated. He had on a heavy overcoat, and it seems impossible that his hand would *accidentally* go under his coat and back as far as the hip pocket. The more reasonable theory is, he retreated and gave back in order to have an opportunity to draw his pistol. He had it in his hip pocket. This fact of course he knew. When Tidd went in the office, he went out. He came back and then gave the insult. It was some time before any blow was struck, and he had ample opportunity to adopt a plan of operations. He designedly provoked a difficulty and expected to be assaulted, and when assaulted he declined to fight as his adversary was fighting with his hands and fists. We cannot believe that during all this time it never occurred to him that he would use his pistol if it became necessary. At least, the jury was well warranted in not believing it.

But there is another theory presented by the evidence and the instructions of the court, upon which the defendant could rightfully be convicted of murder of the second degree. To justify a homicide on the ground of self-defense two things must concur : *First.* The slayer must apprehend danger of losing his life or receiving great personal injury, and his action must be to avert this apprehended danger. *Second.* There must be reasonable cause for this apprehension. The defendant says Tidd assaulted him in a violent manner, and he thought he was in danger. As it turned out Tidd had no weapon, and defendant was only slightly injured. According to some of the witnesses, the difficulty was trivial. That Tidd made no serious effort to injure defendant is apparent from the fact that the latter had no wound about the face, and only slight wounds in the back of the head and neck. It is true, defendant says he had congestion of the brain, about ten days after the homicide, so the doctors told him, but that evidently did not result from injury Tidd inflicted on him. The excitement resulting from taking human life, and the contemplation

of the consequences to himself, no doubt did prostrate him. Tidd had a wound on his neck in front, and his lip was cut. The jury, which was the sole judge of the reasonableness of defendant's apprehension of danger of great personal injury, found that he had no reason to believe this. The jury having found this fact, then there was no self-defense in the case, no matter what defendant thought about it.

This is elementary law. If the jury found that defendant had no reasonable cause to apprehend great personal injury, they were justified in finding all the elements of murder of the second degree, wilfulness, premeditation and malice aforethought, present in defendant's act. He did not act in the heat of passion. This he stated himself. An assault will not mitigate a homicide, unless it produce passion, and the party act under its operation. If the slayer act from an old grudge, and not from passion suddenly aroused by a legal provocation, it is murder at common law. In this case the defendant had a grudge against Tidd, and he says his passion was not caused by Tidd's act at the time, and, hence, if he shot and killed Tidd without having reasonable cause to apprehend danger of great personal injury, he was guilty of murder, and his conviction must stand.

V. H. C. Brinckley, a witness for the state, testified that the defendant after the shooting came over where he (witness) was and said, "Did I do right?" Witness replied that he did not think he did, to which defendant replied, "Didn't you see he was beating me to death?" Witness replied, "I don't know anything about that." No objection to this evidence was interposed at the time, but the prosecuting attorney asked the witness again what reply he made to defendant's question, "Did I do right?" and then defendant objected. The court overruled the objection, and defendant excepted. The testimony was then repeated by the witness. It is now argued that the court erred in permitting the witness to state what *he* said to defendant. Conceding that exception to the evidence was properly saved, which is very doubtful, we do not

think the court erred in overruling the objection. The state, beyond question, had a right to all that defendant said in regard to the homicide, and, to make what he said intelligible, it was necessary to have what the witness said to him. Where facts, some competent to go in evidence and some not, are so connected that one cannot be understood without the others, it is proper to admit them all. The weight of a given fact must be determined by a consideration of its connections and concomitant circumstances. *State v. Greenwade*, 72 Mo. 298; *State v. Cooper*, 85 Mo. 256.

VI. It is also assigned for error that the court ought to have permitted the defendant to prove by one of the witnesses that Tidd had boxing gloves, and practiced with them. This evidence was not competent in this case. When it is doubtful which one of the parties brought on the difficulty, and was, therefore, the aggressor, evidence of the desperate character and quarrelsome disposition of the injured party is admissible. But here there is no question as to who provoked the difficulty, and, besides that, the offered evidence did not tend to prove that Tidd was desperate or quarrelsome. We cannot perceive, however, why defendant offered this evidence, or why the state objected to it. The only possible defense defendant had in the case was that he entered into the difficulty with no design to use a deadly weapon, and that during the heat and excitement of the conflict he drew the pistol, and fired the fatal shot in self-defense. This evidence would have tended to negative that defense. It was offered, of course, to show that Tidd, being a practiced boxer, defendant could not cope with him in the ordinary way, and this would have strengthened the position that defendant did not, from the start, intend to fight a fair fight. We have carefully examined this record, and we must say that defendant had an eminently fair trial. The instructions were more favorable to him than the

law authorized. Tidd was quietly at his desk attending to his business when defendant wilfully insulted him, and in a short time, probably five minutes, he was a dead man; cut off without a moment's notice, or the least signal of warning. The jury has said defendant was guilty of murder of the second degree. The trial judge, who heard all the evidence and saw the witnesses, refused to set aside the verdict, and we do not deem it our province to interfere in the case. The writer of this opinion thinks the judgment ought to be affirmed, but GANTT, P. J., and MACFARLANE, J., are of the opinion there ought to be a new trial for the reasons given in separate opinions filed by them. It is, therefore, ordered that the judgment be reversed, and the case remanded for new trial.

MACFARLANE, J.—I have given the evidence in this case careful consideration, and am of the opinion that the jury should have been instructed on manslaughter in the third degree predicated upon the evidence of defendant, and the circumstances of this deplorable homicide.

The evidence shows that defendant, who was a freight-train conductor, was in the office when deceased, who was night operator, came in to relieve Shores, the day operator. Defendant was dressed and waiting for orders to take out his train. He had on a heavy overcoat, a glove on his left hand, and held a glove and lantern in his right hand. He left the room to go to his train, and was called back by Shores for additional orders. He came in, and, as he passed deceased on his way to the desk occupied by Shores, he spoke the words "Black-headed fool." These words provoked a noisy and abusive quarrel. Opprobrious names and epithets were applied by each to the other. There is but little doubt that the first demonstration of an assault was made by deceased, all advances were made by him and the evidence tends strongly to prove that he struck

the first blow. During the whole altercation defend-ant continued to hold his lantern and glove in his right hand, and made no preparation to be ready for the use of his pistol, though after the first threatened assault he had time to have done so. These circum-stances convince me that defendant, up to the time the fight commenced, entertained no intention or thought of using his pistol, or of either killing deceased, or doing him any bodily harm. After defendant had been driven back by the superior strength of deceased, across the room, and had been thrown on his back, and deceased was striking him over the head, the fatal shot was fired. Defendant testified on the trial. After testifying in regard to the altercation, the beginning, and progress of the fight until deceased had thrown him down, he said : "I put my hand on the floor as I fell, to save my fall, and tried to get up again, and he just shoved me down ; the back of my hand came in contact with the butt end of my revolver; he kept me down, and com-menced pounding me—pounding me on the head pretty hard ; I felt like, if he gave me many more of these blows, it would be the end of me ; when my hand touched the revolver, I pulled it for the sole purpose of disabling him, so he would stop hitting me ; I fired the first shot ; there were two loads in my pistol ; it held five loads ; did not shoot any more after the first shot ; I simply wanted to disable him, so as to get him off of me."

The facts and circumstances, I think, are entirely consistent with this testimony. In such case an instruction should have been given, predicated upon the evidence given by defendant. Such has been the rule since the defendant in a criminal case has been given the right to testify in his own behalf. *State v. Banks*, 73 Mo. 592 ; *State v. Palmer*, 88 Mo. 568 ; *State v. McKinzie*, 102 Mo. 622. The exceptions made to this rule have gone no further than to deny the right to instructions when the physical facts and the uncontra-dicted acts of a defendant conclusively contradict his

testimony, as in case of *State v. Bryant*, 102 Mo. 24; *State v. Turlington*, 102 Mo. 662, and cases cited.

Taking defendant's testimony into the account, it appears very clear to me that there was evidence in the case, which tended to prove that the homicide was committed "in a heat of passion," and "without a design to effect death," and that an instruction should, therefore, have been given upon the third degree of manslaughter. *State v. Elliot*, 98 Mo. 150; *State v. Wilson*, 98 Mo. 440; *State v. Wensell*, 98 Mo. 137; *State v. McKinzie*, 102 Mo. 622.

There was evidence from which the jury might readily have inferred that the fighting, in which the parties engaged, was not preconcerted by defendant; in fact he testified that he had no intention or expectation, while the quarrel was in progress, that it would result in a fight.  The fight itself, growing out of the altercation, was sufficient to inflame the passions, and produce that heat of blood, which would reduce the crime from murder to manslaughter. *State v. Wilson*, 98 Mo. 449, opinion by BLACK, J., and authorities cited.

Some importance is given to the testimony of defendant when he says that he did not shoot "in the heat of passion." Taking the connection in which this declaration is made we do not think he intended to use his language in a technical sense, if he himself knew what its technical meaning was. He said : "It ( the shooting ) was not in the heat of passion ; did not think of shooting till my hand touched the pistol." The jury should have taken his declaration with the other facts and circumstances, the quarrel and fight, and the condition and situation of the parties at the time, and from them all together determined whether or not the shooting was in the heat of passion.

GANTT, P. J., agrees with me.  For this error the judgment is reversed and cause remanded.

GANTT, P. J.—I concur in all that has been said by Judge MACFARLANE, and I desire to say that in my opinion the verdict of murder in the second degree is not warranted by the evidence.

The meeting between deceased and defendant was itself accidental. Had not the operator, Shores, recalled the defendant, he would not have met the deceased that evening. After he returned, he made no preparations for a fight of any kind. He was still incumbered with overcoat, gloves and lantern. The evidence discloses that defendant was a boy of eighteen years, his assailant a man of twenty-seven years, weighing one hundred and sixty pounds.

The man began the assault, continued it when no resistance to amount to anything was being offered by defendant; the defendant had received a serious wound on his head only a short time before this by collision with a railroad bridge. His attempt to protect his head from the blows of the deceased is consistent with the universal law of self-preservation, and it was only when forced entirely across the office, and when he was completely at the mercy of his antagonist for whom he was evidently no match, that he remembered his revolver, pulled it and fired. The most that can be said is that he may have exceeded what was necessary to protect his life, and, if so, he is guilty of manslaughter only in some degree. But, it seems to me, it is a clear case of self-defense. One in his condition knowing the danger to his head, from a blow, and seeing no way of eluding his adversary, cannot be held to discriminate with too much nicety as to the amount of force he may use to protect his life or body from threatened and impending injury. There is no evidence that he sought or brought on the difficulty with a felonious intent to kill Tidd or do him any bodily harm, nor is there in my opinion evidence enough to justify a verdict based upon the fact that he voluntarily engaged in the fight. To me it

appears that Tidd was forcing the fight and defendant was endeavoring to withdraw. If he was so doing in good faith, notwithstanding his imprudent language in the beginning, and his adversary still pursued him, then if taking life became necessary to save his own, he was justified. *State v. Partlow*, 90 Mo. 608; *State v. Hill*, 4 Dev. & Bat. 491. But in no view of this evidence was the defendant guilty of murder in either degree.